IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO
_____

UNITED STATES OF AMERICA,

       Plaintiff,

v.                                                            No. CR 04-303 MV

**LAZARO BENITEZ** and
**STEPHANIE CARRILLO,**

       Defendants.

## MEMORANDUM OPINION AND ORDER ON MOTIONS TO SUPPRESS

**THIS MATTER** came before the court for an evidentiary hearing on June 2, 2004, on Defendant Lazaro Benitez's Motion to Suppress Evidence [#40] and Defendant Stephanie Carrillo's Motion to Suppress Evidence [#38]. This court, having fully considered the evidence presented at the hearing, the memoranda of the parties, and the relevant authorities, GRANTS Defendant Benitez's motion to suppress and DENIES Defendant Carrillo's motion to suppress.

**I.   FINDINGS OF FACT**

These findings are based on the testimony and exhibits, including the video of the stop.

On November 1, 2003, at approximately 10:20 p.m., Roswell Police Department Officer Jimmy Preston observed a green Jeep Cherokee make a right

turn across to the inside lane of travel. He stopped the Jeep because he believed this amounted to a violation of both a New Mexico statute and a Roswell city ordinance. As he approached the passenger side of the Jeep he recognized the driver, Lazaro Benitez, because Benitez had previously been incarcerated at a prison where Preston had worked as a guard.

Although Preston had stopped Benitez in the same vehicle weeks earlier, it appears the initial stop was related to the perceived violation of the motor vehicle code. Preston asked Benitez for his driver's license, insurance, and registration, and asked the passenger, Stephanie Carrillo, for identification. When she was unable to locate identification, Officer Preston asked Carrillo for her name, date of birth and age. She indicated she was 20 years old. On cross-examination, Preston indicated he believed that Benitez's level of nervousness was consistent with that of the average motorist who has been stopped for a traffic violation. Preston then returned to his patrol car to write a warning citation and to determine whether there were any outstanding warrants on either Benitez or Carrillo. The computer revealed no outstanding warrants.

While Officer Preston was writing the citation, Roswell Police Department Officer William Marion arrived. The two officers subsequently approached the Jeep. Preston asked Benitez to get out of the vehicle and briefly frisked him. Less than fifteen minutes into the stop Preston issued the warning citation, which Defendant signed. While Benitez was signing the citation, Preston asked him numerous questions about street rumors he had heard suggesting that Benitez had

been selling narcotics and pointed out that he was driving a car with fancy accessories. Benitez said that he had not been selling drugs. Preston then informed Benitez that he was free to leave and returned his documents. However, because he smelled alcohol and knew that Benitez was on parole and was therefore not likely permitted to consume alcohol, Officer Preston asked Benitez whether he had been drinking. When Benitez admitted that he had consumed one beer and that there was some beer inside the vehicle, Preston asked Benitez who his probation officer was. Preston then asked Benitez if there was anything else inside the vehicle he should know about, and Benitez responded that there was not. Preston repeatedly indicated he was disturbed by the rumors he had heard "here and there" that Benitez "was slinging a little dope" and his observation Benitez seemed to have a lot of money for car accessories.

     After this conversation, and while Benitez was still standing outside, Preston walked over to the driver's side of the Jeep and leaned his head and upper body into the vehicle. In doing so, he observed a large wad of money in the slightly open center console of the Jeep. He then asked Carrillo to get out of the vehicle, went back and talked to Benitez briefly, and subsequently returned to the driver's side of the Jeep. On the video Preston appears to again be leaning into the cab, before returning to the back of the Jeep to talk with Benitez. Although the audio was not activated at this point, the video shows Benitez turned around and put his wrists together, suggesting that Preston go ahead and cuff him for arrest about five minutes after the citation was issued. When the audio later came on, Benitez

repeatedly asked Preston if he was going to be arrested, and suggested that Preston go ahead and arrest him if he was going to. Preston told Benitez that he was not arresting him yet, but nonetheless advised Benitez of his *Miranda* rights, and asked him about the money he had seen in the Jeep. Preston also directed Benitez to get behind the Jeep and not to move. Benitez informed him that there was approximately $4,000-$5,000 in the Jeep and that he did not know who it belonged to. He also told Preston that the Jeep did not belong to him. Preston subsequently asked Benitez for consent to search the vehicle. Benitez declined to give consent, stating that the vehicle was not his. He also admitted that if he permitted Preston to search the Jeep, he would probably have to go back to prison.

      Preston later returned to his car to telephone Benitez's probation officer. After Preston indicated what he had found and repeated the rumors Benitez was allegedly selling drugs, the probation officer simply asked Preston to call him back if he needed him. (Although Benitez was ultimately arrested for the parole violation, an arrest warrant was not issued until substantial further interrogation was conducted.) After talking with the probation officer, Preston again asked Benitez whose money was in the car. Benitez replied that he did not know, and reiterated that it was not his vehicle. Preston then told Benitez that he was going to "jam himself up." (During the period the audio was operating, Preston repeatedly informed Benitez that he was "jamming himself up.")

      About fifteen minutes after issuing the warning, Preston returned to the driver's side of the Jeep and leaned in. He then asked Benitez where the beer he

had mentioned was located, and Benitez directed him to the passenger side of the vehicle. (A bag with three bottles of beer in it was found on the floor of the passenger side of the Jeep.) Benitez again turned around as if to be handcuffed, but Preston told him that he was not going to jail yet. Benitez then told Preston that he did not want to talk to him anymore, after which Preston went to talk to Carrillo.

When asked about the money in the car, Carrillo informed Preston that the money belonged to both Benitez and herself, and that they had been saving the money to go to Florida. After talking with Carrillo, Preston went back to talk to Benitez and asked him to empty his pockets. Preston later questioned Carrillo a second time, asking her about the money and other questions, such as whether she had ever been arrested. At some point, Preston asked Carrillo about the beer that was in the Jeep, and she informed him that it belonged to Benitez.

Forty minutes into the "stop," Agent Steve Meredith of the Chaves County Drug Task Force arrived. While looking into the windows of the Jeep, he observed a Diet Rite can that appeared to him to be old and worn around the top. He was aware that soda cans were sometimes used as safes (in which drugs or other items could be concealed), and believed that this can might be such a safe.

A state police officer eventually arrived with a narcotics dog. The dog alerted to the vehicle. Following the second call to the probation officer, Benitez was arrested for violating parole. Carrillo was arrested for Possession/Consumption of Alcohol by a Minor (a violation of a Roswell city

ordinance). A search of Benitez's wallet revealed $1,080. Following arrest the officers also found a digital scale with cocaine residue and $985 in Carrillo's purse. In addition, a subsequent search of the Jeep (pursuant to a search warrant) revealed relatively small amounts of methamphetamine, cocaine and marijuana (all of which were located in the Diet Rite can) and $5,895 cash.

Defendants have moved to suppress the statements they made to the officers and all evidence seized.

## II. DISCUSSION

As an initial matter, the Court concludes that the Jeep was properly stopped by Officer Preston, based on suspicion of a traffic violation. *See United States v. Gregory*, 79 F.3d 973, 978 (10th Cir. 1996); N.M. Stat. Ann. § 66-7-322. The continuing interrogation unrelated to the traffic stop and the continued detention of Defendants following the issuance of the warning citation are more problematic. When conducting a traffic stop, an officer "may request a driver's license and vehicle registration, run a computer check, and issue a citation." *United States v. Walker*, 933 F.2d 812, 815 (10th Cir. 1991) (quoting *United States v. Guzman*, 864 F.2d 1512, 1519 (10th Cir. 1988)). As a general matter, however, in the absence of any reasonable suspicion, an officer may not interrogate the driver about matters not related to the traffic stop. *See, e.g. United States v. Turner*, 928 F.2d 956, 959 (10th Cir. 1991). And after the officer has issued a citation, continued detention is permissible only when "(1) during the course of the traffic stop the officer acquires an objectively reasonable and articulable suspicion that the driver is engaged in

illegal activity . . . or (2) the driver voluntarily consents to the officer's additional questioning." *United States v. Sandoval*, 29 F.3d 537, 540 (10th Cir. 1994).  Neither exists here.  *See United States v. Fernandez*, 18 F.3d 874 (10th Cir. 1994).

Although Officer Preston informed Benitez that he was free to leave after he issued the warning citation and returned Benitez's documents, the video demonstrates the encounter between Benitez and Preston after the citation was issued was not consensual.  The tone used by his former guard, the substance of Preston's questioning of Benitez about his rumored drug sales, and directions about where to stand undercut any inference of consent.  This is reinforced by the silent video showing Benitez repeatedly turning around and placing his hands out to be cuffed and Preston repeatedly directing him where to stand and "not to move."  Officer Preston often used an accusatory voice, seemed to demand answers to his questions, and repeatedly informed Benitez that he was "jamming himself up."  Furthermore, Officer Preston returned to question Benitez even after Benitez informed him that he did not want to talk to him anymore.  When combined with the presence of Officer Marion, these amount to a "coercive show of authority . . . that would negate a reasonable person's belief that he or she was free to leave." *Id.* at 540-41.  Accordingly, the Court finds that the continued detention of Benitez following the issuance of the citation was not justified by consent.

"In the absence of a particular individual's valid consent an officer may expand an investigative detention only if there exists an 'objectively reasonable and articulable suspicion' that criminal activity has occurred or is occurring."

*United States v. Williams*, 271 F.3d 1262, 1267 (10th Cir. 2001).  Because Officer Preston was aware that Benitez was on parole and was not permitted to consume alcohol, when he detected an odor of alcohol on Benitez's person and noticed that Benitez appeared nervous, he had reasonable suspicion to detain him to investigate the possible parole violation even though he had told Benitez he was free to leave.  But that suspicion did not permit Preston to detain Benitez indefinitely.  As Preston testified, although he could and did contact Benitez's probation officer, he did not have authority to arrest Benitez for the parole violation.  *See* N.M. Stat. Ann. § 31-21-14.  Shortly after Benitez had informed Officer Preston that he had consumed one beer and had some beer in the Jeep, Preston contacted Benitez's probation officer.  At that time, Officer Preston had done all that he was legally authorized to do with regard to the parole violation.  Preston told another officer he wasn't going to "violate him for a little beer."  There was no indication that a warrant would immediately be issued for Benitez's arrest and Preston could not act in the absence of a warrant.  Indeed, the warrant was not actually sent by Benitez's probation officer until 1:37 a.m. following the dog alert.  Accordingly, once he talked to the probation officer, Preston did not have authority to continue to detain Benitez merely based on suspicion of a parole violation.

     Nor was the continued detention of Benitez supported by reasonable suspicion of any other criminal activity.  Officer Preston did not testify that he had any reason to suspect that Benitez was driving while intoxicated.  While he did twice mention suspicion of drug dealing, this was admittedly based exclusively on

rumor. Rumor is legally insufficient.  *United States v. Soto-Cervantes*, 138 F.3d 1319, 1322 (10th Cir. 1998); *Northrop v. Trippett*, 265 F.3d 372, 383 (6th Cir. 2001).[1]  The continued detention of Benitez was consequently unlawful, and the evidence seized during the search of the vehicle and Benitez's wallet, as well as the statements Benitez made during the illegal detention, must be suppressed.  *See United States v. Santana-Garcia*, 264 F.3d 1188, 1191 (10th Cir. 2001) ("If Defendants' detention was illegal, as a general rule any evidence obtained as a result of their detention must be excluded as fruit of the poisonous tree.").

The detention of Defendant Carrillo is somewhat different.  First of all, her detention may not be justified on the basis that the officers had reasonable suspicion to suspect that she possessed or had consumed alcohol.  Officer Preston

---

[1]  Officer Preston's factual basis for reasonable suspicion that Benitez was involved in drug-related activity would, at minimum, be dependent on a proper observation of the money in the center console of the Jeep.  Significantly, Preston observed the money by leaning his head and upper body into the vehicle.  An officer may change the position of his body while outside a vehicle to observe items inside the vehicle that are in plain view.  *Texas v. Brown*, 460 U.S. 730, 740 (1983).  In such circumstances there is no legitimate expectation of privacy because "[t]he general public could peer into the interior of [the] automobile from any number of angles."  *Id.*  But an officer conducts a search if he physically intrudes into the vehicle.  *United States v. Ryles*, 988 F.2d 13, 15 (5th Cir. 1993); *State v. Epperson*, 703 P.2d 761 (Kan. 1985); *cf. New York v. Class*, 475 U.S. 106, 114-15 (1986) (officer conducted a search by reaching into vehicle and removing papers that were covering the vehicle identification number; "a car's interior as a whole is . . . subject to Fourth Amendment protection," and "the intrusion into that space constituted a 'search'").  Because there was clearly not probable cause to search the vehicle at that time, *see United States v. Ross*, 456 U.S. 798, 809 (1982), and because there was no other reason for Preston to lean into the vehicle (such as concern for his safety, *see United States v. Winters*, 221 F.3d 1039, 1041-42 (8th Cir. 2000)), the search of the Jeep violated the Fourth Amendment.  Preston's discovery of that money was, then, the product of an unreasonable search.

did not detect an odor of alcohol on her person or see her in possession. Furthermore, even though he was ultimately directed to the beer[2] on the floor of the passenger side of the Jeep, Carrillo told Officer Preston that the beer belonged to Benitez. Benitez admitted that he had beer in the Jeep and that he had been drinking beer when he clearly had an incentive to deny that the beer belonged to him. There was consequently no reason for the officers to suspect that Carrillo was drinking, or in possession of, the beer. Therefore, the detention of Carrillo may not be justified on that basis.

      The Court likewise concludes that the continued detention of Carrillo was not consensual. There is no indication that Carrillo was informed that she was free to leave, or that this message was conveyed to her in any way. To the contrary, Officer Preston's questions were communicated to Carrillo in such a way that the encounter cannot properly be viewed as consensual. At one point he also instructed Officer Marion to "get her back over here for me." Moreover, after he questioned her about the money, Officer Preston testified he would not have allowed her to leave.

      Nor was her detention initially justified based on a reasonable suspicion of drug-related activity. The discovery of the money, however, places her in an analytically different posture. Carrillo is in a different legal position than Benitez on the discovery of the money. Because Carrillo was a passenger in the Jeep, and

---

[2] Indeed, in spite of Preston's hearing testimony that he initially saw the beer on the vehicle floor, it is clear from the videotape that Preston first learned of the beer and its location from Benitez.

there is no evidence that she had a possessory or property interest in the Jeep, she does not have standing to challenge a search of the Jeep. *United States v. DeLuca*, 269 F.3d 1128, 1132 (10th Cir. 2001). Thus, Officer Preston's intrusion into the vehicle during which he observed the money did not violate Carrillo's Fourth Amendment rights. While the money alone is not sufficient to establish reasonable suspicion, *United States v. Guzman*, 864 F.2d at 1520, *overruled on other grounds, United States v. Botero-Ospina*, 71 F.3d 783 (10th Cir. 1995), it is a part of the totality of the circumstances that may be considered. *Maryland v. Pringle*, 124 S, Ct. 795, 800 n. 2 (2003). Once Preston began asking about the money he developed different stories; Benitez denying knowledge of the source of ownership of the money and Carrillo claiming it was a joint vacation fund. At that point Preston had reasonable suspicion and a basis for involving the narcotic dog, which alerted. The discovery of the drugs, then, became inevitable, and Carrillo's motion must be denied. *Pringle, supra; DeLuca, supra*, at 1132.

III. CONCLUSION

The court GRANTS Defendant Benitez's Motion to Suppress Evidence and DENIES Defendant Carrillo's Motion to Suppress Evidence.

SO ORDERED this 30th day of June, 2004.

                                                                  *Bruce D. Black*
                                                                  **BRUCE D. BLACK**
                                                                  **United States District Judge**